# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER A. SCHREINER, MICHAEL A. SCHREINER, and MARK CORTINO, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. SMOKELESS TOBACCO CO., ALTRIA GROUP, INC., and LESLIE WARD, <br><br> Defendants. | No. 17 C 7530 <br><br> Judge Sara L. Ellis |

## OPINION AND ORDER

After U.S. Smokeless Tobacco Co. ("USST") terminated Plaintiffs Christopher A. Schreiner, Michael A. Schreiner, and Mark Cortino from their jobs at USST's factory, Plaintiffs filed this case against USST, Altria Group, Inc. ("Altria"), and Leslie Ward. They bring claims for breach of contract, defamation, and intentional infliction of emotional distress ("IIED"). Defendants USST and Ward (collectively, "Defendants") have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Because all of Plaintiffs' claims require interpretation of the collective bargaining agreement between USST and Plaintiffs' union, § 301 of the Labor Management Relations Act ("LMRA") preempts Plaintiffs' claims, warranting dismissal of the complaint.

---

[1] Plainitffs have not yet served Altria with the complaint. Because USST and Ward's arguments for dismissal apply equally to Altria, the Court extends them to Altria because Plaintiffs had the opportunity to respond to them. *See Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 1986) (court may *sua sponte* enter judgment in favor of additional non-moving defendants if motion by one defendant is equally effective in barring claim against other defendants and plaintiff had adequate opportunity to respond to the motion); *Roberts v. Cendant Mortg. Corp.*, No. 1:11-CV-01438-JMS, 2013 WL 2467996, at *5 (S.D. Ind. June 7, 2013) (although three defendants had not entered appearances and it was not clear if they had been served, court could impute arguments made by other defendant to all of them and dismiss claims against all defendants).

# BACKGROUND[2]

Altria produces and markets tobacco, cigarettes, and other related products. It acquired USST, a smokeless tobacco manufacturer, in January 2009. On October 27, 2016, Altria announced that it would close two of its manufacturing facilities by 2018. The closings included USST's factory in Franklin Park, Illinois, which employed approximately 300 individuals. Although Altria did not specify how many employees would lose their jobs, it indicated that employees would be offered the opportunity to relocate to other facilities. Following the announcement of the Franklin Park factory closure, USST installed additional security cameras in the factory.

Plaintiffs all worked at USST's Franklin Park factory. The Schreiners had worked there since May 24, 2013 as production mechanics. Cortino worked there since January 7, 2015. Plaintiffs worked the third shift, with the option to work four hours early or stay four hours late. They are parties to a collective bargaining agreement between SEIU Local #1 (the "Union") and USST (the "CBA").[3] The CBA sets forth certain rights and responsibilities of USST and its employees, provides USST with management rights, and requires the parties to pursue a specified process for any grievances that arise between them.

---

[2] The facts in the background section are taken from Plaintiffs' complaint and are presumed true for the purpose of resolving Defendants' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). A court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). Where a document is referenced in the complaint and central to Plaintiffs' claims, however, the Court may consider it in ruling on the motion to dismiss. *Id.*

[3] The Court considers the CBA, which Plaintiffs explicitly reference in the complaint and is central to their claims. Plaintiffs refer to two agreements between USST and the Union, but the one relevant to this Court's analysis is that in effect during the time period covered by Plaintiffs' complaint, entered into in 2015.

On January 27, 2017, a production supervisor informed employees at the Franklin Park factory that something had gone wrong with the video jets. The following day, around 11:00 p.m., Food and Drug Administration ("FDA") representatives called Plaintiffs for individual questioning. Ward, USST's manager of employee relations at the Franklin Park factory, Ed M., the head of maintenance, and Charles B., a union steward, also attended the questioning, which focused on Plaintiffs' whereabouts on December 21, 2016. Plaintiffs learned that the investigation extended beyond the video jets, but they did not receive additional specific information.

On January 30, 2017 at approximately 6:30 a.m., Michelle Allen called a plantwide meeting to discuss non-product related material ("NPRM") found in product produced at the Franklin Park plant. Several days later, on February 2, 2017, Eddy, a supervisor, told Plaintiffs to sit in the public cafeteria between 7:00 a.m. and 10:45 a.m. to await further questioning. While Plaintiffs waited, other employees gave Plaintiffs looks of disgust and teased them. One employee referred to the table where Plaintiffs sat as the "criminal table." Doc. 1-2 ¶ 37. Eventually, Plaintiffs moved to a smaller cafeteria to await questioning. During individual questioning, Plaintiffs learned they each were accused of criminal activity regarding the NPRM. That same day, Allen held another plantwide meeting, announcing that USST was placing previously promised severance payments on hold until it resolved the NPRM issue. Allen also asked employees to come forward with information about any suspicious activity. Later that day, Ward and Dave Rogan individually advised Plaintiffs they were among four people of interest in the NPRM matter and that USST was suspending them without pay until further notice. Plaintiffs also received letters from USST, which Ward signed, to the same effect.

3

Security then escorted Plaintiffs out of the building without letting them gather their personal belongings.

On February 13, Ward called Plaintiffs and told them to appear for a meeting on February 14 at 11:00 a.m. to answer questions. She indicated the questions would be voluntary and that they could gather their belongings afterwards. Plaintiffs then contacted their Union and requested the presence of a union representative at the meeting, to which the Union agreed. But the union representatives were not allowed to attend the questioning, with USST taking the position that the matter had become a criminal one. During these meetings, Plaintiffs learned that USST drilled out the locks from Plaintiffs' toolboxes and searched their contents without having a union representative present. The Schreiners also received subpoenas for fingerprints from federal agents, complying on February 16.

On February 28, at approximately 7:30 a.m., a SWAT team forced entry into Cortino's house, zip-tying Mark and his four children's hands behind their backs for approximately forty-five minutes. Eventually, Mark and his family left the house. The SWAT team searched the house for five hours. On March 1, a representative of the FDA, Mike Bush, went to the Schreiners' mother's house and advised her to talk sense into her children because he would "hate for 'something terrible to happen if this was not resolved.'" *Id.* ¶ 77.

On May 15, 2017, Plaintiffs received letters from USST indicating that USST had terminated their employment effective immediately. The letters also stated that Plaintiffs were ineligible for severance benefits and back wages for the period of their suspension. While suspended, Christopher sought but did not receive a job at Peacock Foods Greencore USA. USST told the hiring manager at Peacock Foods that Christopher was a primary suspect in the NPRM situation.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.     Section 301 Preemption

Defendants argue that § 301 of the LMRA, 29 U.S.C. § 185, preempts Plaintiffs' claims. Section 301 preempts "claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987) (quoting *Elec. Workers v. Hechler*, 481 U.S. 851, 859 n.3, 107 S. Ct. 2161, 95 L. Ed. 2d 791 (1987)). "If the resolution of a state law claim depends on the meaning of, or requires interpretation of, a collective bargaining agreement, the application of state law is preempted and federal labor law principles must be employed to resolve the dispute." *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 499 (7th Cir. 1996).

Here, § 301 clearly preempts Plaintiffs' breach of contract claim, which alleges that USST breached the CBA by, among other things, terminating Plaintiffs without cause, failing to perform a proper investigation, refusing to allow a union representative to attend the meetings held on February 14, 2017, and drilling out the locks on Plaintiffs' toolboxes without a union representative present. *See Greenslade v. Chicago Sun-Times, Inc.*, 112 F.3d 853, 868 (7th Cir. 1997) (where plaintiff alleges breach of collective bargaining agreement, his "common law breach of contract claim is preempted by § 301 of the LMRA"). Indeed, Plaintiffs do not appear to contest the preemption of this claim, failing to address the breach of contract claim in their response to Defendants' motion to dismiss.

The analysis is not as straightforward for the IIED and defamation claims, although the result ultimately is the same. "[N]ot every cause of action that involves labor-related activities depends on an interpretation of a collective bargaining agreement for its resolution." *United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 864 (7th Cir. 1998). Instead, the Court must consider whether resolution of the IIED and defamation claims requires interpretation of the CBA. *Atchley*, 101 F.3d at 499. To recover for IIED, Plaintiffs must allege that "(1) defendants' conduct was extreme and outrageous; (2) defendants either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) defendants' conduct actually caused severe emotional distress." *Lifton v. Bd. of Educ. of City of Chicago*, 416 F.3d 571, 579 (7th Cir. 2005) (quoting *Thomas v. Fuerst*, 803 N.E.2d 619, 625, 345 Ill. App. 3d 929, 281 Ill. Dec. 215 (2004)). Plaintiffs' IIED claim arises from allegedly extreme and outrageous conduct Defendants undertook in connection with the investigation into the NPRM, including, presumably, the denial of union representation during questioning, the drilling of their toolboxes without union representatives present, their termination, and other

6

actions undertaken during the course of the investigation. These allegations necessarily require interpretation of the CBA. As examples, Defendants posit that the CBA provides USST with certain management rights, including the right to suspend or discharge employees for just cause, direct the work force, and require employees to observe USST's rules and regulations. 2015 CBA Art. 3, Sec. 1, Doc. 19-1 at 26. The CBA also provides employees with the right to have a union representative present in office interviews. 2015 CBA Art. 6, Doc. 19-1 at 31. This is not a case where adjudication of the IIED claim would merely require the Court "to focus on the same facts that would control resolution of an employee's contractual remedy." *Douglas v. Am. Info. Techs. Corp.*, 877 F.2d 565, 570 (7th Cir. 1989). Instead, to determine whether Defendants' actions amounted to extreme and outrageous conduct or instead were authorized by the CBA, the Court will have to interpret these provisions of the CBA. *Id.* at 571–73 (finding that "a court's determination of whether the defendant's allegedly wrongful conduct was 'extreme and outrageous' may turn on the meaning of various provisions of the collective bargaining agreement," including both explicit and implicit terms of that agreement, where that conduct directly related to the terms and conditions of the plaintiff's employment); *see also Chapple v. Nat'l Starch & Chem. Co. & Oil*, 178 F.3d 501, 508 (7th Cir. 1999) (finding IIED claim preempted where it would require consideration of whether employer acted within scope of CBA's management rights clause).

Similarly, the defamation claim requires interpretation of the CBA's explicit and implicit terms. "To state a claim for defamation, a plaintiff must allege (1) that the defendant made a false statement concerning him and (2) that there was an unprivileged publication to a third party with fault by the defendant, (3) which caused damage to the plaintiff." *Tuhey v. Ill. Tool Works, Inc.*, No. 17 C 3313, 2017 WL 3278941, at *5 (N.D. Ill. Aug. 2, 2017). Defamatory statements

7

are actionable *per se* without allegations of damages when they involve the imputation of an inability to perform the duties of office or employment or when they prejudice a party or suggest a lack of ability in Plaintiffs' trade, profession, or business. *Id.* Plaintiffs claim Defendants made various defamatory statements or engaged in symbolic speech in the course of the investigation into the NPRM and the ensuing termination process. As with the IIED claim, the Court will have to examine the CBA's management rights provision to assess the extent to which Defendants' statements are privileged or truthful. *See Estes v. Beta Steel Corp.*, No. 2:06-CV-221, 2006 WL 3542731, at *6 (N.D. Ind. Nov. 7, 2006) (defamation claim preempted where allegedly defamatory statement was made in the course of termination proceedings covered by the collective bargaining agreement); *Peffley v. Durakool, Inc.*, 669 F. Supp. 1453, 1462 (N.D. Ind. 1987) (defamation claim preempted where truthfulness of allegedly defamatory statement depended on inquiry into "just cause" provisions of CBA); *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 529–30 (10th Cir. 1992) (state law claims, including claim for defamation, preempted where analysis of whether defendant acted properly in conducting its investigation and terminating plaintiffs would require analysis of collective bargaining agreement's provisions); *Owens v. United Parcel Serv., Inc.*, No. 92-C-0570-S, 1993 WL 546784, at *3 (D. Utah Apr. 30, 1993) ("[A] defamation claim arising out of an employer's investigation, discipline or discharge of a union represented employee is preempted by § 301."). *Krasinski v. United Parcel Service, Inc.*, which Plaintiffs cite, is distinguishable, where the complaint in that case made no reference to a collective bargaining agreement and resolution of whether the allegedly defamatory statements were made with malice did not depend on interpretation of such an agreement's terms. 530 N.E.2d 468, 471–72, 124 Ill. 2d 483, 125 Ill. Dec. 310 (1988). Here, by contrast, the defamation claim is inextricably intertwined with the CBA and so preempted by § 301.

## II.     Appropriate Remedy

Having found all of Plaintiffs' claims preempted, the Court must determine the appropriate remedy. The Supreme Court has indicated that a preempted state law claim "must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985). Defendants argue that even if the Court treats the claims as § 301 claims, they are nonetheless subject to dismissal because Plaintiffs have not exhausted the mandatory grievance and arbitration procedures established by the CBA. Although Defendants correctly note that employees must exhaust administrative remedies before bringing suit in federal court unless certain exceptions apply, *see McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 616 (7th Cir. 2001), failure to exhaust is an affirmative defense that Plaintiffs need not have anticipated in their complaint, *see Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 533 (7th Cir. 2006); *Thompson v. Fairmont Chicago Hotel*, 525 F. Supp. 2d 984, 991–92 (N.D. Ill. 2007). Plaintiffs plead no facts in the complaint demonstrating that they failed to exhaust,[4] and although they essentially admit as much in their response brief, they also assert conflicting facts as to whether one of the exceptions to the exhaustion requirement—that USST repudiated the grievance procedure—could apply. *See* Doc. 29 at 4 n.4 (reporting that a union representative

---

[4] Plaintiffs argue that exhaustion is not mandatory because Section 10 of Article 5 of the 2015 CBA, which provides that "[a]ny employee discharged or suspended by the Company who has not filed a grievance under Section 1 . . . may within five (5) business days after suspension or discharge, file a grievance," uses permissive and not mandatory language. Doc. 19-1 at 30. But the use of the permissive "may" does not make the grievance procedure optional. *See Allis-Chalmers Corp.*, 471 U.S. at 204 n.1 ("The use of the permissive 'may' is not sufficient to overcome the presumption that parties are not free to avoid the contract's arbitration procedures."); *Lopez v. Smurfit-Stone Container Corp.*, No. 02 C 7347, 2003 WL 297533, at *5–6 (N.D. Ill. Feb. 10, 2003) (plaintiffs required to arbitrate claims where agreement provided that "[i]f the parties are unable to arrive at a satisfactory settlement at this step, the Union may submit the grievance to arbitration" (alteration in original)). Reading the CBA's grievance procedures as a whole, the CBA sets forth a sequential dispute resolution process that must be followed, with the use of the word "may" in Section 10 offering an alternative timeline for part of the grievance process for those suspended or discharged without having previously filed a grievance under Section 1 of Article 5 of the CBA. *See* Doc. 19-1 at 28–30.

told counsel for Plaintiffs that USST refused to participate in the grievance procedure, but that the same individual told Defendants' counsel that USST was participating in a grievance proceeding). Because it appears that some form of grievance proceeding may be underway, and to allow Plaintiffs the opportunity to consider how best to proceed on their claims in light of the Court's preemption findings, the Court will dismiss Plaintiffs' complaint without prejudice as preempted by § 301 of the LMRA.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss [18]. The Court dismisses the complaint without prejudice.

Dated: June 12, 2018

_____
SARA L. ELLIS
United States District Judge