UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER A. SCHREINER, MICHAEL A. SCHREINER and MARK CORTINO, Plaintiffs, | ) ) ) ) ) |
| vs. | ) No. 1:17-cv-07530 ) |
| U.S. SMOKELESS TOBACCO CO. ALTRIA GROUP, INC. and LESLIE WARD Defendants. | ) Hon. Sara L. Ellis ) ) ) |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

NOW COMES Plaintiffs Christopher A. Schreiner, Michael A. Schreiner and Mark Cortino, by and through their attorney Michael J. Young and complaining of Defendants, U.S. Smokeless Tobacco Co., Altria Group, Inc., and Leslie Ward, states as follows:

**JURISDICTION AND VENUE**

1. Plaintiffs filed state law claims in the Circuit Court of Cook County. Defendants, U.S. Smokeless Tobacco Company Co., Altria Group, Inc. and Leslie Ward removed this matter pursuant to 28 U.S.C. 1331, 1367, 1441 and 1446 claiming federal question and supplemental jurisdiction. Venue is proper as the actions complained of occurred within the Northern District of Illinois.

1

## PARTIES

2. Plaintiff Christopher A. Schreiner ("Christopher") is an individual and resident of DuPage County, Illinois.

3. Plaintiff Michael A. Schreiner ("Michael") is an individual and resident of DuPage County, Illinois.

4. Plaintiff Mark Cortino ("Mark") is an individual and was a resident of Cook County, Illinois.

5. Defendant U.S. Smokeless Tobacco Company ("USST" or "Employer") is a subsidiary of Altria Group, Inc. ("Altria").

6. Defendant Altria Group, Inc., is a Virginia Corporation and parent company to co-defendant USST, headquartered in Richmond, Virginia.

7. Defendant Leslie Ward ("Ward") is or was a Manager of Employee Relations for defendants USST and Altria.

8. USST is headquartered in Richmond, Virginia and has a manufacturing facility in Franklin Park, Cook County, Illinois.

9. While an employee and agent of USST and Altria, Ward conducted business on behalf of USST and Altria in Franklin Park, Cook County, Illinois.

## NATURE OF THE CASE

10. Plaintiffs set forth all the following paragraphs and allegations based upon information and belief.

11. Altria is an American corporation and is one of the world's largest producers and marketers of tobacco, cigarettes, and related products.

12. On January 6, 2009, Altria acquired USST, a smokeless tobacco manufacturer.

13. On October 27, 2016, Altria announced that Altria would be closing two of its manufacturing facilities by early 2018, affecting approximately 580 workers.

14. This announcement followed shortly after Altria reported a 29 percent drop in profits for its most recent quarter. The reported income in the 3 months ending on September 30, 2016, was $1.09 billion, compared to $1.53 billion during the same period in the previous year.

15. The company did not specify how many employees would be laid off, but said that their employees would be offered the chance to relocate to other facilities.

16. The plant closures were expected to save Altria approximately $50 million and be completed by early 2018.

17. The Altria factory located in Franklin Park, Illinois which employed approximately 300 workers, was one of the two facilities to be closed.

18. Following the announcement of the plant closures, USST installed additional security cameras in the Franklin Park facility.

19. Christopher had been employed with USST since May 24, 2013, as a Production Mechanic.

20. During his employment with USST, Christopher received several Employee of the Month awards and was considered by USST to be a good employee.

21. Christopher maintained a perfect attendance record while employed with USST.

22. Michael had been employed with USST since May 24, 2013, as a Production Mechanic.

23. During his employment with USST, Michael was nominated for Employee of the Month, losing to his brother Christopher.

24. Michael maintained a perfect attendance record while employed with USST and was considered by USST to be a good employee.

25. Mark had been employed with USST since January 7, 2017.

26. Christopher, Michael and Mark worked the third shift at USST, and each had the option to work four hours early or four hours late each day.

27. Plaintiffs are members of the Service Employees International Union Local No. 1 (the "Union").

28. On March 1, 2015, USST and the Union entered into a collective bargaining agreement (the "CBA"), for the Skilled Trades Division.

29. On or about January 27, 2017, at a morning meeting, Javier C., a USST production supervisor advised the employees at the Franklin Park facility that something had gone wrong with the video jets and all employees could have overtime if they desired.

30. On or about January 27, 2017, at approximately 11:00 p.m. Plaintiffs were called into the office for individual questioning by representative of the United States Food and Drug Administration. Ward the head of maintenance and Charles B. a, union steward, were also present.

31. At a meeting held on January 28, 2017, Plaintiffs were individually questioned regarding their whereabouts on December 21, 2016.

32. Plaintiffs were advised during their individual interrogations that the situation was more serious than the video jet, but no specifics were provided.

33. On or about January 30, 2017, at approximately 6:30 a.m., Michelle Allen from USST called a facility-wide meeting.

34. The meeting was called due to non-product related material ("NPRM") being found in a product produced at the Franklin Park facility.

4

35. On or about February 2, 2017, Plaintiffs were told by their supervisor "Eddie" to sit in the public cafeteria to be questioned for a second time, between the hours of 7:00 a.m. and 10:45 a.m.

36. Private offices were available for this purpose, but despite the availability of a private setting, USST forced Plaintiffs to sit in the public forum of the cafeteria.

37. There was a heightened alert throughout the facility regarding the seriousness of the NPRM being found in the products produced at the facility.

38. Fellow co-workers teased, taunted and poked fun at the Plaintiffs as they sat waiting to be interrogated in the cafeteria.

39. One employee named Jerry, referred to the table where Plaintiffs sat as the "criminal table."

40. Christopher requested that he and the other Plaintiffs be allowed to move to a less public area while awaiting interrogation.

41. Plaintiffs were embarrassed to be required to sit at a cafeteria table for public viewing where other employees could view them and give looks of disgust.

42. Plaintiffs were allowed to move to another cafeteria to await interrogation.

43. After being kept on public display, Plaintiffs were finally called in for individual interrogation at approximately 10:45 a.m. and were informed that they were accused of criminal activity regarding the NPRM.

44. Mark was told that the "other guys" implicated him.

45. When Christopher was questioned, he was asked his nationality, and was questioned regarding the nationality of his wife and Michael.

46. On or about February 2, 2017, another facility wide meeting was called and conducted by Michelle Allen.

5

47. A majority of the facility employees were extremely angry as it was announced that the promised severance pay would be placed on hold until the NPRM issue was resolved.

48. Michelle Allen asked that all employees in attendance come forward with the names of anyone who they even thought could be involved, requesting all information on any activity that the employees deemed suspicious, whether or not it was relevant to the NPRM, and suggested that the employees look towards one another and provide information about anything they deemed unusual in their work areas.

49. On February 2, 2017, Plaintiffs were individually asked to go to the safety conference room, where Ward and Dave Rogan advised Plaintiffs they were among four persons of interest in the NPRM matter.

50. Plaintiffs were told that they were either suspects or were withholding information.

51. Plaintiffs were told they would be suspended without pay until further notice, and USST would notify them when they would be allowed to return to work.

52. Plaintiffs were then escorted from the building by security without being allowed to retrieve personal property, including tools, which they would need to be employed with a different employer.

53. On or about February 2, 2017, Plaintiffs each received a letter from USST, signed by Ward stating that USST had identified them as persons of interest in the ongoing NPRM matter and further advising them that they were suspended immediately, without pay, pending the outcome of the investigation.

54. On or about February 3, 2017, Defendants told Plaintiffs that the other Plaintiffs had accused them of being involved in product tampering.

6

55. On or about February 13, 2017, Plaintiffs received a call from Ward advising them that they needed to attend a meeting at 11:00 a.m. on February 14, 2017, to face another round of interrogation. Ward told Plaintiffs that their attendance was voluntary and they would be able to obtain their personal belongings at that time.

56. The Plaintiffs each contacted the Union and requested representation at the meeting.

57. The Union advised the Plaintiffs that a Union representative would be in attendance.

58. Although representatives from the Union were present at the meeting, they were denied access to the interrogation room by USST, with USST claiming that Union representation was not appropriate as the investigation was criminal in nature.

59. The Union representatives remained on the premises, but outside of the interrogation.

60. During the meetings, Plaintiffs learned that USST had burglarized their personal tool boxes by drilling through the locks and searching the contents, and had done so without notice to Plaintiffs and without any Union representatives present to witness the procedure.

61. A letter addressed to Christopher, dated February 14, 2017, acknowledged that he had the right to remove his toolbox from the facility, but USST would not allow Christopher to remove his toolbox when he left the facility.

62. Christopher and Michael were then served with subpoenas for their fingerprints to be taken at the Dirksen Federal Building.

63. On February 16, 2017, Christopher and Michael appeared pursuant to the subpoenas and were fingerprinted.

64. On or about February 23, 2017, Plaintiffs received a letter, pursuant to the WARN Act Notice, with information regarding USST's plan to permanently close the Franklin Park facility.

65. On or about February 28, 2017, at approximately 7:30 a.m., a S.W.A.T. team smashed its way into Mark's home using battering rams simultaneously on all his exterior doors.

66. At that time, Mark's children Zach, age 21; Randy, age 19; and Channing, age 11, were all in the home.

67. Flash grenades were deployed, followed by extremely loud explosions and smoke, along with S.W.A.T. storm troopers rushing the home, barking orders for everyone including the children, to get to the ground.

68. The invading force was heavily armed, even though there were no weapons on the premises, and assault rifles were trained on Mark and his children.

69. Mark and the children were then zip tied with their hands behind their back and forced into the living room.

70. After completing a 45 minute interrogation, the zip ties were finally removed.

71. Mark's wife arrived home from work and removed the children to safety at an aunt's house.

72. Mark was asked to leave his home so as not to witness it being ransacked for the following 5 hours.

73. Mark's home was damaged and pillaged, with personal items strew about and damaged, drawers open, trash sifted through, drywall destroyed, carpeting burned, and every door including the garage door damaged.

74. Mark's homeowner's insurance paid out approximately $11,000.00 for the damage.

75. On or about March 1, 2017, Mike Bush ("Bush") from the United States Food and Drug Administration, appeared at Christopher and Michael's mother's home.

8

76. Bush told the mother that she and her husband needed to talk some sense into their boys.

77. Bush told the mother that Christopher and Michael were protecting someone they did not really know.

78. Bush stated that he would hate for "something terrible to happen if this was not resolved."

79. Bush then tried to get a phone number for Christopher and Michael's father who was not home at the time.

80. On or about May 15, 2017, each Plaintiff received a letter which stated that USST had determined to terminate their employment immediately.

81. The letter stated that the Plaintiffs would not be eligible for the severance benefits to be paid on account of the facility closing and would not receive back pay for the period of their suspension.

82. During his suspension, Christopher was denied a job opportunity at Peacock Foods Greencore USA because a hiring manager was told by USST that Christopher was the prime suspect in the NPRM investigation.

83. The CBA is limited to wages, benefits, terms and conditions of employment.

84. The CBA does not address tortuous acts against employees.

85. Defamation is not a term or condition of employment and the CBA does not provide a mechanism to redress Defendants tortious conduct.

86. Article 5, Section 2 of the CBA provides in relevant part:

> "...Although the Company (USST) agrees that it will only deal with the designated representatives of the Union on such matters as are properly a subject for collective bargaining..."

9

87. Defamation is not a subject of collective bargaining and is not a proper subject for collective bargaining.

88. As defamation is not a covered subject of collective bargaining Plaintiffs are not restricted to redressing their damages through the grievance procedure set forth in the CBA.

89. Even if the process of seeking damages for defamation were a proper subject of collect bargaining, it would be futile to pursue a grievance as the Defendants by their actions have indicated their intention to harm the Plaintiffs and will not compensate Plaintiffs for their losses.

90. Plaintiffs are not required to partake in a futile process that will not resolve their claims.

91. Pursuant to the CBA, after Step 1 of the grievance procedure, the Union has total discretion as to whether, or how far to pursue a grievance.

92. The Union has failed or refused to pursue the Plaintiffs' grievances with or about the Defendants and their actions, and Plaintiffs have exhausted all remedies available to them pursuant to the CBA. On March 9, 2018, the Vice President of Local 1 (Union) notified each Plaintiff by letter, stating:

> "Your case was presented in front of the Grievance Merit Board for determination of its merits for further processing. The Grievance Merit Board, after presentation of all the evidence and arguments regarding your grievance, has determined that your grievance is lacking in merit to be successfully pursued through arbitration. Please be advised that with that decision from the Grievance Merit Board your grievance has been closed. Therefore, Local 1 will not take any further action on your behalf regarding this particular grievance".

## FIRST CLAIM FOR RELIEF
## DEFAMATION

93. Plaintiff hereby realleges and and reaffirms paragraphs 1 through 92 as if the same were set forth here verbatim.

94. On or about February 1, 2017, Plaintiffs were told by a supervisor to sit in a public cafeteria for several hours while waiting to be interrogated by USST, Altria, Ward and the FDA.

95. Defendants did not take any reasonable steps to keep the investigation confidential with respect to their suspicions regarding Plaintiffs.

96. Defendants encouraged a "witch hunt" by asking that Plaintiffs sit in a public area for several hours as each was called in for interrogation.

97. By forcing Plaintiffs to sit and remain in a public area, Defendants were effectively accusing Plaintiffs of a crime and communicating that accusation to all other employees.

98. Hundreds of thousand of dollars in severance pay and benefits, if not more, were at risk to be denied to all or the majority of employees affected by the facility closing, due to the NPRM problem.

99. The symbolic speech of USST in singling out the Plaintiffs publicly and forcing them to sit at a table in a public setting, resulted in rumors and speculation that Plaintiffs were the persons responsible for the NPRM problem, and created the impression to Plaintiffs co-workers that Plaintiffs were the persons responsible for their loss of severance benefits. No other employees were placed on public display.

11

100. USST had a duty to use reasonable care to minimize the defamatory effects of their investigation, and the defamatory effects on Plaintiffs character and reputation among their colleagues and supervisors.

101. USST could reasonably foresee that singling Plaintiffs out to sit and wait at a table in the cafeteria for hours would reflect USST's bias toward Plaintiffs as suspects in the NPRM problem.

102. Defendants were improperly motivated to fast-track the investigation and cut corners to get to the desired resolution.

103. On or about February 2, 2017, Plaintiffs each received a letter from USST, signed by Leslie Ward, which stated that each Plaintiff was a person of interest in the ongoing product tampering probe and suspending them without pay pending the outcome of the investigation.

104. On or about February 3, 2017, Plaintiffs were told they were being accused of criminal conduct regarding the NPRM.

105. On or about February 3, 2017, Defendants told each of the Plaintiffs that the other Plaintiffs had accused them of being involved in product tampering.

106. On or about May 15, 2017, Plaintiffs each received letters stating that they were terminated effective immediately.

107. Defendants made statements to the media, which were not true and which slandered the Plaintiffs.

108. These statements have defamed Plaintiffs in their trade, business and professions.

109. Defendants were negligent in failing to determine the truth of the defamatory statements and actions.

110. Defendants intentionally or recklessly failed to determine the truth of the defamatory matter.

111. Defendants knew that they had no basis in fact for their statements and actions and knew that their defamatory statements and actions were false and untrue.

112. Defendants acted with utter disregard as to their defamatory words and actions which were false and untrue.

113. Defendants acted with malice and ill will toward the Plaintiffs.

114. The actions of Defendants are egregious, and with complete disregard for the truth and were willful and wanton and merit an award of punitive damages.

115. Plaintiffs' right to be free from defamation has been denied under the common law of the State of Illinois.

116. Plaintiffs' claim for damages is controlled, and determined by state law and can be adjudicated without interpreting the CBA.

117. The actions of the defendants, their employees and agents and each of them as alleged herein, were known, ratified, and approved by the officers or managing agents of the defendants and each of them, thereby entitling Plaintiffs to punitive or exemplary damages against USST and Altria, in an amount to be determined at trial.

118. As a direct and proximate result of the wrongful acts of the Defendants as aforedescribed, Plaintiffs have suffered and continue to suffer from humiliation, anxiety, emotional distress, worry and fear.

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT

119. Plaintiff hereby realleges and and reaffirms paragraphs 1 through 118 as if the same were set forth here verbatim.

120. Plaintiffs are beneficiaries of the CBA.

121. Article 5, Section 10 of the CBA prohibits discipline or discharge without just cause.

122. The suspension of Plaintiffs was without just cause.

123. The termination of Plaintiffs was without just cause.

124. The CBA requires the presence of a Union representative during any disciplinary meeting, and provides in relevant part:

> "... any employee who is called into an office for an interview, after the employee believes he or she has been sufficiently informed of the subject of the interview, may request and obtain the presence of a Union Steward during such interview. When the request is made by the employee to have a Union Representative be present, the Company must comply, regardless of whether a grievance is involved or not."

125. USST breached its obligations pursuant to the CBA by failing to conduct a proper and unbiased investigation into the NPRM incident; in refusing to allow Plaintiffs Union representation; breaking into the Plaintiffs' tool boxes prior to their discharge, while under investigation and with no Union Representative present during the search; disciplining Plaintiffs without cause; and in terminating Plaintiffs without cause.

14

126. Defendants undertook these actions as described above intentionally, oppressively and maliciously with an evil and malevolent motive to injure Plaintiffs, resulting in the termination and damage to the Plaintiffs.

127. As a direct and proximate result of the wrongful acts of the Defendants as aforedescribed, Plaintiffs have suffered and continue to suffer from humiliation, anxiety, emotional distress, worry and fear.

128. As a direct and proximate result of USST's breach of the CBA, Plaintiffs have suffered and continue to suffer substantial losses in earnings, back pay, severance pay and benefits, and raises which Plaintiffs would have received had USST not breached the CBA.

## THIRD CLAIM FOR RELIEF
## INTENTIONAL INFLECTION OF EMOTIONAL DISTRESS

129. Plaintiff hereby realleges and reaffirms paragraphs 1 through 128 as if the same were set forth here verbatim.

130. Defendants' conduct as described herein was extreme and outrageous.

131. Defendants knew there was a high probability their conduct would inflict severe emotional distress upon Plaintiffs.

132. Defendants recklessly disregarded the high probability that their conduct would inflict severe emotional distress upon Plaintiffs and their conduct did in fact cause Plaintiffs severe emotional distress.

133. Plaintiffs suffered medically significant and diagnosable emotional distress as a result of Defendants' actions as set forth above.

WHEREFORE, Plaintiffs, Christopher A. Schreiner, Michael A. Schreiner, and Mark Cortino pray this Honorable Court enter judgment in their favor against Defendants, U.S. Smokeless Tobacco, Altria Group, Inc. and Leslie Ward, jointly and severally as follows:

A.  Awarding compensatory damages in the amount of $250,000.00 to each Plaintiff;

B.  Awarding exemplary damages in an amount that is found to be fair and just based upon the Defendants' assets;

C.  An award of attorney fees and costs associated with having to bring this action; and,

D.  Granting such other and further relief as may be equitable and just.

Respectfully submitted,

Dated: August 31, 2018

Michael J. Young (A.R.D.C. # 6226487)
Law Office of Michael J. Young
9842 Roosevelt Road
Westchester, Illinois 60154
(708) 410-0090
Email: EsqMichaelYoung@Yahoo.com